FILED
DISTRICT COURT OF GUAM
NOV 1 4 2003
MARY L. M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| LOUIS VUITTON MALLETIER and CHANEL, INC. and PRADA, S.A., <br><br>Plaintiffs, <br><br>vs. <br><br>HANA TRADE CORPORATION, dba HONOLULU GIFT SHOP aka U.S.A. T-SHIRTS, et al., <br><br>Defendants. | CIVIL CASE NO. 03-00013 <br><br><br>**ORDER** |

This matter came before the Court on Plaintiffs' Motion for Default Judgment, in which Plaintiffs seek statutory damages. For the reasons discussed below, the Court awards Plaintiffs $75,000 in statutory damages.

**I. FACTS.**

Plaintiffs Louis Vuitton Malletier, Chanel, Inc., and Prada, S.A. (collectively "Plaintiffs") are world-renowned producers of high-quality luxury goods. (See V. F. Am. Compl. ¶¶ 14-28.) Plaintiffs have expended great time, energy, and money in promoting their products under their trademarks. (Id.) Defendant Hana Trade Corporation ("Defendant") owns and operates a store called U.S.A. T-Shirts and Gift Items (a.k.a. Honolulu Gift Shop), which is located on the first floor of the Pacific Plaza Building, on the corner of Marine Drive

1

and Old San Vitores Road in Upper Tumon, Guam. (Id. ¶ 6; J. Arriola Decl. ¶ 2.) Catering mostly to tourists, Defendant sells T-shirts and other items. (V. F. Am. Compl. ¶ 29.) On February 19, 2003, agents of Plaintiff Louis Vuitton visited Defendant's store, in search of products infringing Louis Vuitton's trademarks. (Mitsuoka Decl. ¶¶ 1 & 5.) After the agents asked about counterfeit merchandise, store employees led them to a back room approximately 12 feet wide by 20 feet long. (Id. ¶ 7.) T-shirts and other clothing covered the "secret" door to this back room. (J. Arriola Decl. ¶ 5.) Inside the room, which was fancier than the other parts of the store, (Id.), the agents saw several bags, leather goods, and other items with Plaintiffs' markings, displayed on shelves, (Mitsuoka Decl. ¶ 8). Defendant's employees informed the agents that the items were "copies" made in the United States and that they were one-third to one-half the price of the genuine articles. (Id. ¶ 9.) Specifically, Defendant's employees stated that they sold Louis Vuitton wallets from $220 to $280 apiece and Louis Vuitton bags from $250 up. (Id.) The agents purchased several items, including a Louis Vuitton wallet for $230, a small black Prada handbag and keycase for $170, a Chanel bracelet for $50, and a Prada cell phone strap for $50. (Id. ¶¶ 10-11.) Defendant's employees then gave the agents three Gucci cell phone holders and a Louis Vuitton cell phone holder for free. (Id. ¶ 12.) The agents gave to their attorney all of the items obtained from Defendant. (Id. ¶ 24.) Later, Plaintiffs seized from Defendant about 796 counterfeit goods bearing Plaintiffs' trademarks. (J. Arriola Decl. ¶ 3 & Exs. 1-11.) Plaintiffs have never given Defendant authority to deal in their products, much less use their trademarks. (Mitsuoka Decl. ¶ 24; V. F. Am. Compl. ¶ 29.)

On May 5, 2003, Plaintiffs filed with the Court a Verified Complaint, which was later served on Defendant. Plaintiffs also filed a Temporary Restraining Order, which the Court granted against Defendant on May 13, 2003. Plaintiffs then filed a Verified First Amended Complaint herein on June 23, 2003, which, along with a Summons, was served on Defendant on July 8, 2003. The Clerk of Court entered Default against Defendant on August 4, 2003. On August 6, 2003, Plaintiffs then filed a Motion for Default Judgment against Defendant. The Court heard oral arguments on the motion on September 19, 2003, and instructed

2

Plaintiffs to supplement the record in order for the Court to determine statutory damages. On September 26, 2003, Plaintiffs filed a Supplemental Memorandum of Points and Authorities in Support of Motion for Default Judgment and Statutory Damages Against Defendant, as well as a Supplemental Declaration by attorney Joaquin C. Arriola, Jr. On October 17, 2003, the Court granted Plaintiffs' Motion for Default Judgment and issued a permanent injunction against Defendant, ordering Defendant to destroy all counterfeit items infringing on Plaintiffs' trademark rights and to not commit future trademark violations against Plaintiffs. As of the date of this Order, Defendant has failed to answer or defend.

**II. DISCUSSION.**

Plaintiffs seek statutory damages pursuant to 15 U.S.C. § 1117(c)[1], which applies here because Defendant used counterfeit marks in connection with the sale, offering for sale, or distribution of goods. Although Plaintiffs claim that Defendant used nineteen counterfeit marks, "Plaintiffs only seeks [sic] damages for three of the marks." (Supp. Mem. P. & A. at 4.) Plaintiffs assert that Defendant unlawfully used these counterfeit marks on four types of goods[2]. (Mem. P. & A. at 9.) Plaintiffs request that the Court award them $300,000, which would be divided evenly among the three Plaintiffs ($100,000 each) for the unlawful trafficking of at least one of each Plaintiff's trademarks.

Courts have broad discretion in determining a statutory damages amount. Section

---

[1] Section 1117(c) states:

In a case involving the use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect ... to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of–
    (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sell, or distributed, **as the court considers just**; or
    (2) if the court finds that use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, **as the court considers just**.

15 U.S.C. § 1117(c) (2003) (emphases added).

[2] These four types of goods are handbags (large bags, backpacks, clutches, purses), small leather items (wallets, checkbooks, keychains, cigarette cases, planners), jewelry (necklaces, watches, earrings, bracelets), and clothing (shirts, scarves, outfits). (Mem. P. & A. at 9.)

3

1117(c) states that a plaintiff could be awarded anywhere from $500 to $100,000 per counterfeit mark per type of good, or, if the defendant's infringement is willful, up to $1 million per counterfeit mark per type of good. 15 U.S.C. § 1117(c)(1)-(2) (2003). Besides the prescribed minimums and maximums, the only limit to setting an award for statutory damages is that the amount awarded must be "as the court considers just." Id.

Because courts lack guidance in setting a statutory damages amount, many courts have looked for assistance to the more copious case law on section 504(c) of the Copyright Act, which provides for statutory damages for willful copyright infringement. See, e.g., Polo Ralph Lauren, L.P. v. 3M Trading Co., No. 97 Civ. 4824, 1999 U.S. Dist. LEXIS 7913, at *13-14 (S.D.N.Y. Mar. 23, 1999); Guess?, Inc. v. Gold Ctr. Jewelry, 997 F. Supp. 409, 411 (S.D.N.Y.), rev'd on other grounds, 158 F.3d 631 (2d. Cir. 1998), cert. denied sub nom; Tiffany Inc. v. Luban, No. 03 Civ. 2824, 2003 U.S. Dist. LEXIS 15910, at *4 (S.D.N.Y. Sept. 11, 2003). In those cases, the courts evaluated factors such as (1) "the profits reaped and the expenses saved by the infringer," (2) "the revenues lost by the plaintiff," (3) "the defendant's cooperativeness in providing information relevant to proof of profits and losses," (4) "the degree of willfulness or the innocence of the defendant," (5) "the need to deter the defendant from future misconduct," (6) "the need to deter potential infringers," and (7) "the value of the copyright ...." Polo, 1999 U.S. Dist. LEXIS 7913, at *14-15 (citing Fitzgerald Pub. Co. v. Baylor Pub. Co., 807 F.2d 1110, 1117 (2d Cir. 1986)).

Regarding factors (1) and (2), a court is not required to consider the defendant's profits or the plaintiff's losses in determining a section 1117(c) award, since statutory damages are an alternative to profits and losses as provided under 15 U.S.C. § 1117(a)-(b). See 15 U.S.C. § 1117(c). As Plaintiffs point out, "there is no necessary mathematical relationship between the size of [a statutory damages] award and the extent or profitability of the defendant's wrongful activities." (Supp. Mem. P. & A. at 3 (quoting Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp. 2d 161, 164-65 (S.D.N.Y. 1999).) Nevertheless, courts find such profits and losses useful in determining a just award of statutory damages. For instance, in Guess?, 997 F. Supp. at 412, the court considered the defendant's annual profits

4

of $45,000 to be very persuasive that it fixed statutory damages at ten percent that amount, or $4,500. Here, Plaintiffs admit that they lack any evidence of Defendant's profits. (Supp. Mem. P. & A. at 3.) Undoubtedly, Defendant's default has made it very difficult for Plaintiffs to determine Defendant's profits or expenses saved. Plaintiffs have not tried to demonstrate any actual losses caused by Defendant's trademark infringement, either. However, as noted earlier, Plaintiffs have supplied the Court with some of the prices charged by Defendant and prices at which Plaintiffs bought counterfeits from Defendant. Still, this sparse information fails to sufficiently inform the Court to the extent necessary for it to determine profits or losses. Plaintiffs have not even offered for the Court's review the prices they normally charge for the corresponding genuine articles. Without evidence of great loss by Plaintiffs, the Court infers that, because Plaintiffs' genuine products cost a lot more than Defendant's corresponding counterfeits[3] and so most likely cater to different clientele, Plaintiffs have not lost many sales as a result of Defendant's infringing activities. See Polo, 1999 U.S. Dist. LEXIS 7913, at *17 & n.5 (stating that "in the absence of any evidence in the record, we suspect ... that a large percentage of purchases of these counterfeit and cut-rate goods in modest storefronts such as that of the defendants do not represent lost sales for the much higher-priced goods sold by plaintiffs"). Therefore, with respect to the first and second factors, the Court finds the record on Defendant's profits and Plaintiffs' losses inadequate to support the amount of statutory damages sought by Plaintiffs.

Regarding the third factor, courts usually award higher statutory damages against defendants who either fail to cooperate in discovery or who are in default than they would against defendants who do cooperate. See, e.g., Sara Lee, 36 F. Supp. 2d at 168-69. Defendant has not cooperated at all in this case. In fact, Defendant has neither answered nor defended. Accordingly, Defendant's default weighs against it.

As to the fourth factor, a defendant admits willful infringement by its default. Microsoft Corp. v. Wen, No. C 99-04561, 2001 U.S. Dist. LEXIS 18777, at *14 (N. D. Cal.

---

[3] As mentioned above, Defendant's employees stated that they charge one-third to one-half of the price of the genuine products. (Mitsuoka Decl. ¶ 9.)

5

Nov. 13, 2001) (citing <u>Televideo Sys. v. Heidenthal</u>, 826 F.2d 915, 917 (9th Cir. 1987), which states that the court holds as true the factual allegations in the complaint where there has been default). Courts find a high degree of willfulness where a defendant's infringing conduct continues after receiving notice of the plaintiff's claims. <u>See, e.g.</u>, <u>Polo</u>, 1999 U.S. Dist. LEXIS 7913, at *4, 9-10 (where the defendant's infringement persisted despite sixteen seizures and injunctive orders and the court awarded $25,000 for each of ten trademarks). Although Defendant's default here proves it behaved willfully, the Court also finds willfulness in the fact that Defendant conducted most of its counterfeiting operations in the small back room of its store and that Defendant apparently closed off this back room from the public but opened it to customers asking for counterfeit merchandise.[4] (J. Arriola Decl. ¶ 5 & Exs. 12-14.) As to the degree of Defendant's willfulness, it is significant that there is no evidence indicating that Defendant, after becoming aware of Plaintiffs' claims, continued infringing Plaintiffs' trademarks, or otherwise actively disregarded Plaintiffs' statutory rights. As a result, the Court finds Defendant's willfulness to be to a minor degree. Thus, this factor supports a statutory damages award much lower than the $300,000 sought by Plaintiffs.

Regarding factors (5), (6), and (7), Plaintiffs have not shown a strong need to deter Defendant, especially since they have not submitted proof that Defendant continued infringing Plaintiffs' trademarks after having received notice of their claims. However, the need to deter potential infringers will always be great due to the high value of the Plaintiffs' trademarks, which the public generally associates with high-quality, high-priced merchandise. Therefore, the amount of statutory damages must be high enough to punish Defendant and to discourage others from infringing on Plaintiffs' valuable trademarks.

In setting an amount for statutory damages, the Court also considers other circumstances of the case to be particularly insightful. First, the Court finds persuasive the limited scope of Defendant's operations. Where infringers sell their wares out of storefront

---

[4] Plaintiffs also offer as evidence of willfulness the fact that Defendant's store occupies the same space as another counterfeiting business brought before this Court in an earlier trademark infringement case. (J. Arriola Decl. ¶ 6.) However, Plaintiffs do not claim that Defendant is in any way related to the earlier infringers, and the Court will not infer such a connection.

6

operations, courts are more inclined to award lower statutory damages, see Rolex Watch U.S.A., Inc. v. Jones, No. 99 Civ. 2359, 2002 U.S. Dist. LEXIS 6657, at *15-16 (S.D.N.Y. Apr. 17, 2002) (citing Gucci Am., Inc. v. Gold Ctr. Jewelry, 997 F. Supp. 399, 401 (S.D.N.Y. 1998) (where the wilful infringer sold out of a storefront and the court ordered it to pay $25,000 per counterfeit mark)), than they would if the infringement is large in scope or advertised over the Internet to limitless potential customers, see id. (where the defendant sold its counterfeit merchandise over the Internet and the court awarded statutory damages of $500,000); see also Tiffany Inc. v. Luban, No. 03 Civ. 2824, 2003 U.S. Dist. LEXIS 15910, at *4-5 (S.D.N.Y. Sept. 11, 2003) (ordering that $550,000 in statutory damages be paid by defendant counterfeiter who sold over the Internet). In this case, Defendant's counterfeiting operations occurred in a very limited physical space. Defendant conducted its infringing activities out of a storefront and kept most of its counterfeits displayed in a small[5], secret back room closed off from the public but open to customers who asked for counterfeit merchandise. In fact, Plaintiffs' photographs of this secret back room, which are hereto attached, reveal a very cramped exhibition of the counterfeits, with purses perched close together on two four-tiered shelves, (see J. Arriola Decl. Ex. 12), wallets or handbooks bunched atop low-rise shelves, (see id. Ex. 13), stray shirts hanging from the walls, (see id.), and jewelry glittering gold out of a small corner of the shelves, (see id. Ex. 14). Besides the tight quarters housing the counterfeits, it appears from the record that the public had limited access to Defendant's counterfeits in that Defendant did not utilize the Internet in furtherance of its counterfeiting scheme. Therefore, Defendant did not have the limitless pool of potential customers that the worldwide web would provide. Additionally, the Court lacks knowledge of the number of customers going in and out of Defendant's store, even though Plaintiffs were instructed to so inform the Court. However, from the pictures submitted by Plaintiffs, the Court concludes that patronage by the general public most likely was low due to the fact that the outside entrance to Defendant's store lacked store signs or any other

---

[5] As stated earlier, the size of Defendant's back room was approximately 12 feet wide by 20 feet long. (Mitsuoka Decl. ¶ 7.)

7

obvious indicators that inside lay merchandise for sale. (See J. Arriola Decl. Ex. 12.) Complicating matters further is the record's silence as to the length of time Defendant has been infringing Plaintiffs' trademarks. Based on the above facts and the sparsity of the record regarding customers and length of time of infringement, the Court assumes that the target market for Defendant's counterfeits was probably small and the volume of customers purchasing these items was not extremely high. Therefore, Defendant's small-time, limited-access counterfeiting operations do not warrant the high award of statutory damages prayed for by Plaintiffs.

Secondly, the Court is influenced by Plaintiffs' failure to indicate whether all 796 counterfeit goods seized from Defendant were for sale by Defendant or were of the type usually sold by Plaintiffs. While section 1117(c) does not require consideration of the number of counterfeit goods sold by Defendant or whether Plaintiffs would sell the corresponding genuine products, see U.S.C. § 1117(c), the Court finds this factor helpful as it relates to profits and losses. Here, to support an award of $300,000 in statutory damages, Plaintiffs emphasize that 796 counterfeit items were seized from Defendant. (Mem. P. & A. at 10.) However, of the 796 counterfeits, about 173 items, which include wallet boxes, felt cloths, watch cases, pen bags, paper bags, felt bags, and a suit cover, seem to the Court to be mere accompaniments to purchased merchandise, thereby producing no profits for Defendant nor losses to Plaintiffs. In fact, as stated earlier, Defendant's employees actually gave away at least four cell phone holders for free. (Mitsuoka Decl. ¶ at 12.) Therefore, Plaintiffs' failure to meaningfully expound upon these goods prevents the Court from factoring the number of seized counterfeits into its determination of reasonable damages.

Thirdly, the Court is persuaded by the evidence submitted by Plaintiffs in support of their assertion that Defendant infringed nineteen of their trademarks. (See J. Arriola Decl. ¶ 4, Exs. 1-11; see also V. Compl. Exs. A-X.) Even though Plaintiffs seek statutory damages for only three counterfeit marks, (Supp. Mem. P. & A. at 4), fairness requires an award that considers Defendant's total infringement. Therefore, the damages per mark should be reasonably increased to reflect Defendant's infringement of the sixteen additional marks.

8

## III. CONCLUSION.

In light of the record and the relevant case law, the Court orders Defendant to pay to Plaintiffs $25,000 per counterfeit mark, or $75,000 total. The Court finds this amount, which is within the range of other statutory damages amounts awarded by other courts for trademark infringement, see, e.g., Polo, 1999 U.S. Dist. LEXIS 7913, at *21 (awarding $25,000 for each of ten trademarks); Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc., No. 96-6961, 1998 U.S. Dist. LEXIS 17282, at *22 (E.D. Pa. Nov. 3, 1998) (awarding $10,000 for one trademark); Guess?, 997 F. Supp. 409 at 412 (awarding $4,500 for one trademark), to be an appropriate and just award.

IT IS SO ORDERED this __14__ day of November, 2003.

JOHN S. UNPINGCO
**District Judge**





EXHIBIT 12





EXHIBIT 13





EXHIBIT 14